UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | No. 21-CR-147 (CKK) |
| v. | ) ) |  |
| CHRISTOPHER SPENCER | ) |  |

# DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

"I understand the necessity for there to be consequences for wrongdoing and justice. As a minister, I also understand the impact grace and compassion can have on an individual who is truly repentant and desires to change."[1]

On the evening of January 5, 2024, Christopher Spencer traveled from North Carolina with his wife and child to Washington, D.C. The purpose of the trip was to see Donald Trump. Mr. Spencer had no plan, intention, or thought to take over the government on January 6th. He was not part of a militia group seeking to overthrow the government.

Mr. Spencer has always accepted responsibility for his conduct. He pled guilty and signed a statement of offense pursuant to a stipulated trial agreement.[2] He attempted to resolve this case short of trial, however, the government insisted on him pleading to the now-vacated 1512 charge. Now, more than 3 years later, Mr. Spencer will be sentenced to the misdemeanor offenses. In the meantime, Mr.

---

[1] David Smith, Pastor of Calvary Baptist Church, Whangarei, New Zealand and life-time friend of Christopher Raphael Spencer. Exhibit 1.

[2] Mr. Spencer's conviction on Count One has been vacated by the Court based on the Supreme Court's decision in *Fischer v. United States*, 144 S. Ct. 2176, 2190 (2024). The vacatur of the only felony against him shows that the government overcharged this case in the first instance.

1

Spencer has faced the challenge of maintaining his life and family, while his wife served time for her conduct on January 6th. He continues to work and support his wife and five children, as the breadwinner of the family. He has been on supervision without any infractions for the last 3 years. Based on the nature and circumstances of the offense, his background, his superb performance on pretrial release, his need to work and provide for his family, other similar cases, and the relevant sentencing factors pursuant to 18 U.S.C. § 3553(a), the defense respectfully requests a lengthy sentence of home detention, which would be a sentence not greater than necessary to address his conduct in this case.

## TIMELINE OF JANUARY 6th EVENTS

The timeline of January 6th is well-known. Approximately 30,000 people were expected to attend.[3] Around 6 a.m. that day, numerous Trump supporters headed towards the rally at the Ellipse and "[m]any began gathering the night before."[4] Mr. Spencer was not one of the individuals who gathered the night before. He did not bring weapons to the Capitol, nor did he wear military gear to the Capitol. Rather, he simply traveled to Washington, D.C. on the evening of January 5th to see Donald Trump.

---

[3]    Though President Trump boasted that the rally numbered "hundreds of thousands of people", the rally's organizers projected just 30,000 participants. *See* Andrew Beaujon, *Here's What We Know About the Pro-Trump Rallies That Have Permits*, The Washingtonian (Jan. 5, 2021), available at https://www.washingtonian.com/2021/01/05/heres-what-we-know-about-the-pro-trump-rallies-that-have-permits/.

[4]    George Petras, Janet Loehrke, Ramon Padilla, Javier Zarracina and Jennifer Borresen, *Timeline: How the storming of the U.S. Capitol unfolded on Jan. 6*, USA Today, Updated Feb. 9, 2021, available at https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/ (last accessed on Feb. 28, 2022).

He and his wife walked to the U.S. Capitol and entered the Senate Wing Doors at approximately 2:19, p.m. These doors were breached approximately 10 minutes earlier and at least 100, people entered through the doors and windows by this time.

As stated in the statement of offense, Mr. Spencer and his wife went into the Crypt. During this time, Chris filmed a Facebook live video during which he stated, inter alia, "Bro, they just stormed the Capitol. Bro…pushed the cops out of the way, everything…took it over." Spencer also yelled "Don't stop!" to rioters as they surged forward. They crossed through Statuary Hall and joined another crowd in the Statuary Hall Connector. Mr. Spencer continued to film a video in which he made other statements, including "Kick that motherfucker open!", when he was outside the House Chamber doors. He spent approximately 30 minutes inside the Capitol.

Mr. Spencer engaged in no violence or destruction of property on January 6, 2021. On January 19, 2021, Mr. Spencer agreed to speak to law enforcement without an attorney about his conduct. He admitted that he was present inside the Capitol. He volunteered that he video-recorded himself while inside. He consented to the search of his phone. He explained truthfully that he never walked into any office and only remained in the hallways. He did not recall every statement he made, but he did not deny making any statements. He explained that the person he was talking to on Facebook during the live videos was his friend "Alec."

Importantly, he stated that he wanted to help with the FBI's investigation, and he did not agree with people beating the cops. He was asked whether he knew

the identity of individuals involved in violence or whether he knew of any groups that were involved. Mr. Spencer did not. He also explained that had he known that people were going to fight the police or bring bombs, he would not have gone or brought his family. He stated that he regretted going. He admitted that he said things he should not have said.

## LEGAL PRINCIPLES

Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1), and Disorderly and Disruptive Conduct in a Restricted Building, in violation of Title 18, United States Code, § 1752(a)(2) are class A misdemeanors, as defined by 18 U.S.C. § 3559(a)(6), because they carry a maximum incarceration period of one year. The United States Sentencing Guidelines apply to class A misdemeanors and suggest a sentencing range between six to twelve months based on four criminal history points and a total offense level of 8. The law states Mr. Spencer is eligible for probation because these Class A offenses are misdemeanors. 18 U.S.C. § 3561(c)(2).

Disorderly and Disruptive Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Four) and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Five), are class B misdemeanors or "petty offenses", as defined by 18 U.S.C. § 3559(a)(7), because they individually carry a maximum incarceration period of six months or less. The United States Sentencing Guidelines (Guidelines) do not apply to class B misdemeanors. *See* U.S.S.G. §1B1.9. In addition, pursuant to 18 U.S.C.

§ 3583(b)(3), the Court is disallowed from imposing a term of supervised release for a petty offense.

Since the Guidelines do not apply, the Court is directed to look to 18 U.S.C. § 3553(a) to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes [of sentencing]." The factors enumerated in 18 U.S.C. § 3553(a)(1) include "the nature and circumstances of the offense and the history and characteristics of the defendant." Additionally, the Court should determine the "need" for the sentence, by considering if and how a term of incarceration would "reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense." *Id.* at (2)(A). Moreover, the Court should consider how a sentence would "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Id.* at 2 (B-D). Further still, the Court must be mindful of "the kinds of sentences available," should consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," and should consider the "need to provide restitution to any victims of the offense." *Id.* at (3), (6), & (7).

**ARGUMENT**

Mr. Spencer is a hardworking 44-year-old father of five who works as a substation technician. His daily focus is working hard to provide for his wife and children. While the nature and circumstances of the January 6th events were indeed serious, his particular actions that day, paired with his individual history and characteristics do not lend itself to a sentence of incarceration. Rather, a non-incarceration sentence would meet the purposes of sentencing, without being overly punitive. It would provide adequate deterrence to Mr. Spencer, avoid an unwarranted sentencing disparity among other January 6th defendants, and is warranted in light of his stellar performance on pretrial release and his family situation.

    **I.**    <u>**Nature and Circumstances of Mr. Spencer's Offense**</u>

Mr. Spencer acknowledges that he should not have entered the Capitol on January 6, 2021, and would never engage in similar behavior again. He recognizes that his presence contributed to the chaos on January 6th. He was regretful for his conduct when he spoke with the FBI. Mr. Spencer was not the cause of January 6th, nor was he in the category of people who caused physical harm to others or damage to the Capitol buildings. He entered the building, but his unlawful entrance cannot, and should not, be conflated with the many other, wider, failures that occurred that day. Various factors led to the Capitol being breached, including "paralysis" "exacerbated by the patchwork nature of security across a city where responsibilities are split between local and federal authorities" and "driven by

unique breakdowns inside each law enforcement agency."[5]  To characterize Mr. Spencer as the proximate cause of the January 6th event fails to acknowledge these other failures, and places an unjust blame on one non-violent, non-destructive individual.  The American system of justice, and specifically 18 U.S.C. § 3553(a), directs this Honorable Court to look at every defendant and every defendant's actions individually.  *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007); *Gall v. United States*, 552 U.S. 38 (2007).

Mr. Spencer traveled to D.C. to see Donald Trump.  He did not intend to harm anyone at the Capitol or overthrow the government.  He did not engage in any violence or destruction.  There is no evidence that Mr. Spencer was a member of any militias or nationalist organizations or groups with a violent intent.

Mr. Spencer entered and exited the Capitol in approximately 30 minutes.  He walked around, recorded himself, and made statements of which he is not proud.  He did not destroy anything.  He did not assault anyone.  He did not directly or intentionally engage with police officers at all or fight officers to enter the Capitol.

## II.   Mr. Spencer's History and Characteristics

As state above, Mr. Spencer is a 44-year-old married father of five.  His daily goals are to work hard to provide for his wife and children.  He is from a close-knit family who all live in North Carolina.  His two youngest children are legally blind

---

[5]   *See* Jacqueline Alemany, et. al., *Before, During, and After Bloodshed*, The Washington Post (Oct. 31, 2021), available at https://www.washingtonpost.com/politics/interactive/2021/what-happened-trump-jan-6-insurrection/?itid=hp-top-table-main.

and require constant care and have required surgery. His work as a substation technician requires long hours maintaining and repairing substation equipment.

Those close to him describe him as hardworking and a provider. His uncle David states that Mr. Spencer "loves his wife and children and works hard to provide for them. He is loved and needed by his family." Exhibit 2. His aunt Brenda explains that "[h]e is a dedicated husband and father." Exhibit 3. She describes that he "takes pride in his work" and "puts his whole heart into whatever he does."

His job provides for his family. His sister Alexis explains that a sentence of incarceration could impact him and his family – "if he receives a heavy sentence. Chris could lose his job that allows him to support his family of 7. If this happens, they could very well lose the ability to pay for housing." Exhibit 4.

Mr. Spencer has overcome his prior decisions that lead to criminal history points. His brother Russell states,

> My brother hasn't been perfect by any means, however 7 years ago he got his life straight. I helped him get a job when no one wanted to give him a chance. He is now there most valuable employee for a landscaping company. He never misses work. He has a family of 7 including two younger disabled children. His responsibility as a Father is tough especially in these current times were living in. My brother supported me throughout my time throughout my Military Career. He is very patriotic and loves his country. In fact if War on America was to break out today he would step up and fight no questions asked for the greatest country on earth.

Exhibit 5. Mr. Spencer's several family members describe that he turned his life around. Exhibit 8.

8

His son-in-law Trent provides further insight into Mr. Spencer and describes how Mr. Spencer has been judged:

> Some often see people with tattoos and immediately result in looking down on them. Although I know his past isn't the best, that most certainly does not define the man that he is today. In my eyes Chris has served his time from this incident and so has his family. Constant reminders from strangers and outsiders asking questions about January 6th, putting him down in front of his family, for example at family meals. I've seen first hand how this has affected this family greatly. Trials and tribulations that haunt this family with pain and sadness in seeing the man that is looked up to as the backbone of his family, broken and at an emotional loss of having to leave his family. My father-in-law has learned from his mistakes and turned them into pivotal learnings in not only his life and the lives of his children, but mine as well.

Exhibit 9.

It is clear from Mr. Spencer's history and characteristics that a non-incarceration sentence would allow him to provide for his family and is not necessary to satisfy the purposes of punishment in this case.

### III. The Requested Sentence Would Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess "the need for the sentence imposed— . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." Incarceration is not required in order for a sentence to reflect the seriousness of the offense. "A sentence of probation rather than incarceration can work to promote the sentencing goal of respect for the law by illustrating a rejection of the view that the law is merely a means to dispense harsh punishment without taking into account the real

9

conduct and circumstances involved in sentencing." *United States v. Bennett*, No. 8:07CR235, 2008 U.S. Dist. LEXIS 45302, at *12 (D. Neb. May 30, 2008) (citing *Gall*, 552 U.S. at 99).

### IV. The Requested Sentence Would Provide Adequate Deterrence to Criminal Conduct and Protect the Public from the Unlikely Chance of Further Crimes of Mr. Spencer.

Under 18 U.S.C. § 3553(a)(2)(B) and (a)(2)(C), this Court must also consider "the need for the sentence imposed—. . . to afford adequate deterrence to criminal conduct...[and] to protect the public from further crimes of the defendant." The public has been protected while Mr. Spencer has been on pretrial release. For the last year, Mr. Spencer has complied with supervision requirements. The public will be protected while Mr. Spencer is being supervised by the Probation Officer, which will further deter any criminal conduct.

While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect." *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016). With respect to specific deterrence, research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime." *Id.* (emphasis in original); *see also* James Austin *et al.*, *How Many Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ.

School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that "across all offenders, prisons do not have a specific deterrent effect. Custodial sentences [jail and prison] do not reduce recidivism more than noncustodial sanctions."). No incarceration is needed to deter criminal conduct in this case.

V. **The Requested Sentence Would Not Create an Unwarranted Sentencing Disparity**

Sentencing Mr. Spencer to a non-incarceration sentence would not contribute to an unwarranted sentencing disparity. Over 500 defendants have been sentenced in these cases.[6] A significant majority of the cases have been resolved as misdemeanor offenses. Defendants in other cases whose conduct was similar to Mr. Spencer's received probationary sentences. Courts have sentenced the following defendants to probation or 30 days incarceration for similar or more egregious conduct than Mr. Spencer's, including where defendants deleted social media posts, and/or yelled at officers, (facts not present in this case):

| Case | Plea & Sentence | Conduct |
| --- | --- | --- |
| *U.S. v. Lance White* 23-CR-360 | 18 U.S.C. § 1752(a)(1) 18 U.S.C. § 1752(a)(2) 40 U.S.C. § 5104(e)(2)(D) 40 U.S.C. § 5104(e)(2)(G)<br><br>60 days' home detention 24 months' probation | • Defendant climbed through a broken window and assisted other rioters to enter the building. ECF 21 at 4. He also used gloves to clear off broken glass and passed items through the windows. Id. at 9.<br>• D exited and re-entered the Capitol three times. Id. at 8. |
| *U.S. v. Lawrence Dropkin* 21-CR-734 | 18 U.S.C. § 1752(a)(1) 18 U.S.C. § 1752(a)(2) 40 U.S.C. § 5104(e)(2)(D) 40 U.S.C. § 5104(e)(2)(G) | • Defendant entered the Capitol through the Senate Wing Doors at 2:17 p.m. and appeared to shout with |

---

6    This estimate is based on the government's chart, filed in other cases.

11

| | | |
|---|---|---|
| | 30 days' incarceration<br>12 months' supervised release | • celebration that he entered the building. ECF No. 22 at 3.<br>• He "was in close proximity" to altercations between MPD officers and rioters inside the Rotunda, and he "observed these altercations, did not disperse after seeing these altercations, and appeared to use his phone to record these altercations." Id. at 9.<br>• He spent approximately one hour inside. Id. at 10. |
| *U.S. v. Christopher Ortiz*<br>22-CR-82 | 40 U.S.C. § 5104(e)(2)(G)<br>12 months' probation<br>60 days' home detention | • Defendant entered the Capitol three times and was inside a total of approximately **13 minutes**. ECF No. 31 at 3-4. |
| *U.S. v. James Brooks*<br>22-CR-18 | 18 U.S.C. § 1752(a)(1)<br>12 months' probation | • Defendant shouted at police officers and spent **10 minutes** inside the Capitol. ECF No. 27 at 3-4. |
| *U.S. v. Eric Gerwatowski*<br>22-CR-125 | 18 U.S.C. § 231(a)(3)<br>24 months' probation<br>30 days' home detention | • Defendant physically pulled open a door closed by Capitol Police officers, directed other rioters inside the Capitol, and spent a few minutes inside the Capitol. ECF No. 25 at 4. |
| *U.S. v. Brennan Machacek*<br>23-CR-121 | 40 U.S.C. § 5104(e)(2)(G)<br>12 months' probation | • Defendant spent **39 minutes** inside the Capitol. ECF No. 21 at 4, 7. |
| *U.S. v. Conlin Weyer*<br>22-CR-169 | 18 U.S.C. § 1752(a)(1)<br>18 months' probation | • Defendant climbed through scaffolding, spent **35 minutes** inside the Capitol, and took a picture on top of a SWAT car. ECF No. 22 at 3-4. |
| *U.S. v. William Keen*<br>23-CR-60 | 40 U.S.C. § 5104(e)(2)(G)<br>18 months' probation | • Defendant encouraged others to enter the Capitol, spent **40 minutes** inside the Capitol, and smoked a cigarette |

| | | |
|---|---|---|
| | | inside the Capitol. ECF No. 22 at 5-6. |
| *U.S. v. David Smither* 24-CR-15 | 40 U.S.C. § 5104(e)(2)(D) 40 U.S.C. § 5104(e)(2)(G) 12 months' probation | • Defendant climbed through a broken window and spent **13 minutes** in the Capitol. ECF No. 15 at 3. |
| *U.S. v. Robert Colello* 24-CR-59 | 40 U.S.C. § 5104(e)(2)(D) 40 U.S.C. § 5104(e)(2)(G) 12 months' probation | • Defendant climbed an exterior wall at the Capitol and spent **1 minute** in the Capitol. ECF No. 9 at 1-2. |
| *U.S. v. Ulises Wilkinson* 23-CR_383 | 40 U.S.C. § 5104(e)(2)(D) 40 U.S.C. § 5104(e)(2)(G) 12 months' probation | • Defendant spent **42 minutes** in the Capitol and entered the Senate gallery. ECF No. 25 at 4-5. |
| *U.S. v. Giorgi Mamulashvili* 24-CR-165 | 40 U.S.C. § 5104(e)(2)(D) 40 U.S.C. § 5104(e)(2)(G) 12 months' probation | • Defendant spent **48 minutes** inside the Capitol. ECF No. 18 at 3-4. |
| *U.S. v. Patricia Todisco* 22-CR-205 | 40 U.S.C. § 5104(e)(2)(G) 24 months' probation | • Defendant entered the Capitol through the Senate Wing Doors and spent **28 minutes inside.** ECF No. 53 at 10. Defendant chanted and yelled inside. |
| *U.S. v. Esther Schwemmer* 21-CR-364 | 40 U.S.C. § 5104(e)(2)(G) 24 months' probation | • Defendant hurled insults at law enforcement officers and spent **15 minutes** inside the Capitol. ECF No. 29 at 4, 7 |
| *U.S. v. Jordan Stotts* 21-CR-00272 | 40 U.S.C. § 5104(e)(2)(G) 24 months' probation | • Defendant shouted at police officers, scaled the wall on the Upper West Terrace, posted on social media, and spent **nearly 1 hour inside**. ECF No. 24 at 1-6 |
| *U.S. v. Robert Snow* 22-CR-00030 | 40 U.S.C. § 5104(e)(2)(G) 12 months' probation | • Defendant entered the Capitol two minutes after the breach, waved people inside, spent **43 minutes inside**, and made his way to the 3rd floor of the building where many staff offices were located. ECF No. 26 at 1-2 |

13

In cases where defendants received even 14 days incarceration (a fraction of the government's request in this case), the defendant's conduct was far worse than Mr. Spencer's. In *United States v. Paul Lovely*, No. 23-CR-19 (CKK), the defendant was associated with a right-wing group and decided to travel to the Capitol with four other individuals. The group entered the Senate Wing doors three minutes after the doors were breached. They proceeded through the Crypt and down to the hall of the Office of the Clerk and Office of the Majority Leader and entered Nancy Pelosi's conference room. The defendant also stood by as one of the members of his group attempted to assault an officer by "ramm[ing] a bicycle rack into an officer." ECF No. 53 at 1-12. The defendant pled guilty to 40 U.S.C. §§ 5104 (e)(2)(D) and (e)(2)(G) and was sentenced to 14 days of intermittent confinement and 36 months of probation.

In *United States v. Victor Martinez*, No. 23-CR-39 (TSC), the defendant led a small group of protestors and pushed his way into the Capitol, celebrated entering the building, recorded violent scuffles between police and protestors, and spent 50 minutes inside the Capitol. During a later FBI interview, the defendant minimized his conduct on January 6th. ECF No. 21 at 1-21. The defendant pled guilty to 40 U.S.C. § 5104 (e)(2)(G) and was sentenced to 14 days of intermittent confinement and 36 months of probation.

In *United States v. Dusty Higgins*, No. 23-CR-59 (RDM), the defendant recorded a video of himself entering the building through a broken window and posted messages on Instagram. The defendant expressed to another individual that

14

he wanted to open a Proud Boys chapter, and his posts on social medial included Three Percenter logo and images. The defendant pled guilty to 40 U.S.C. § 5104 (e)(2)(G) and was sentenced to 14 days of intermittent confinement and 36 months of probation.

In other cases, where defendants pled to the more serious misdemeanor (18 U.S.C. § 1752), they received probation. *See United States v. Rachel Pert*, No. 21-CR-139 (TNM) (sentenced to 24 months' probation); *United States v. Jeffrey Witcher*, No. 21-CR-235 (RC) (12 months' probation); *United States v. Nicholes Lentz*, No. 21-CR-53 (CJN) (1 month home detention and 36 months' probation).

The § 1752 defendants who received intermittent confinement as a part of probation had more egregious than Mr. Spencer.  In *United States v. Blake Reed*, No. 21-CR-204 (BAH).  Reed discussed joining the Proud Boys.  ECF No. 171 at 2. He posted a video of the crowd marching toward the Capitol which included the threat "we are coming for you." *Id.*  He wore protective gear "to ward of[f] officers' attempts to protect the Capitol." *Id.* at 3.  Mr. Spencer did not.  Reed took steps to conceal electronic evidence on his phone.  Mr. Spencer did not.  Reed appears to have mocked law enforcement after the execution of the search warrant. *Id.* at 25.  Mr. Spencer did not.  Reed received 42 days of intermittent confinement as part of his probationary sentence.  Mr. Spencer's conduct was far below Reed's conduct.  Hence, he should not receive a sentence of incarceration.

In *United States v. Schornak*, No. 21-CR-278 (BAH), the defendant received a sentence of 28 days of intermittent confinement and a term of probation.  In that

15

case, Schornak "traveled to the Visitor's Center and stole an American flag." *Schornak*, No. 21-cr-278, Gov't Sent. Memo, ECF 62 at 11.  Mr. Spencer did not steal anything.  Schornak boasted about stealing the flag and causing tyranny inside the Capitol and he was "damn proud of it." *Id.* at 16.  Mr. Spencer did not.

Mr. Spencer's conduct was less egregious than other cases where defendants received probation.  For example, in *United States v. Jackson Kostolsky*, No. 21-CR-197 (DLF), a 40 U.S.C. § 5104(e)(2)(G) case, the defendant "scaled the wall to get to the Upper West Terrace," was tear-gassed, and entered the Capitol through the Parliamentarian doors soon after it was breached.  He also deleted videos from his phone.  These facts are not present in Mr. Spencer's case.

Of the factors that the government deems to be critical in these cases, most of them are mitigating factors in Mr. Spencer's case.  First, when he entered the Capitol, he did not break any windows to gain entry.  Second, Mr. Spencer did not encourage violence.  Third, he did not encourage property destruction.  Fourth, there is no evidence of significant reaction to violence or destruction.  Fifth, during or after the riot, he did not destroy evidence.  Sixth, Mr. Spencer was inside the building for a relatively brief amount of time, and he did not enter the Senate or House chambers where members of Congress were gathering to certify the election.  Seventh, he did not make any notable posts on social media.  Eighth, he provided an honest statement to the authorities about his actions.

## **Conclusion**

Considering the § 3553(a) sentencing factors, a non-incarceration sentence is a sufficient, but not greater than necessary, sentence to satisfy the purposes of sentencing.

                              Respectfully submitted,

                              A.J. KRAMER
                              FEDERAL PUBLIC DEFENDER

                              _____/s/_____
                              Ubong E. Akpan
                              Assistant Federal Public Defender
                              625 Indiana Ave., N.W., Suite 550
                              Washington, D.C.  20004
                              (202) 208-7500